338 So.2d 609 (1976)
STATE of Louisiana
v.
Paula L. SIERRA.
No. 57605.
Supreme Court of Louisiana.
October 6, 1976.
*611 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Sheila C. Myers, Asst. Dist. Atty., for plaintiff-relator.
James A. McPherson, New Orleans, for defendant-respondent.
MARCUS, Justice.
Paula L. Sierra was charged by bill of information with having unlawfully produced a controlled dangerous substance, to-wit: marijuana, in violation of La.R.S. 40:966. Prior to trial, defendant filed a motion to suppress certain physical evidence seized from her apartment pursuant to a search warrant claiming that probable cause did not exist for the issuance of the warrant and, alternatively, that the conduct of the executing officers during the course of the search rendered the search unreasonable under the fourth and fourteenth amendments of the federal constitution. The trial judge sustained defendant's motion to suppress the evidence. We are unable to ascertain from his reasons which of the defendant's contentions formed the basis for his ruling. We granted the state's application for certiorari to consider the correctness of the trial judge's ruling.
On September 10, 1975, five officers of the New Orleans Police Department, acting under the authority of a warrant, conducted a thorough search of defendant's apartment for approximately one and one-half hours. While none of the items listed in the warrant was recovered, one of the officers inadvertently came across a flower pot containing one hundred and forty-five marijuana plants as he waited on the balcony of the apartment for another police car which was to pick the officers up. Upon further investigation, a second pot was found atop a bird cage in the defendant's living room. This evidence forms the basis of the offense with which the defendant is charged and is the object of her motion to suppress.

I.
The state argues that, if defendant's motion to suppress the evidence was sustained based on the alleged insufficiency of the search warrant's supporting affidavit, the ruling by the trial judge was in error.
The supporting affidavit relates in essence the following facts. On September 8, 1975, Officers Anthony Canatella and Earl Hardouin spoke to a confidential informant who had in the past given them information leading to arrests and convictions, and, more particularly, to the recovery of stolen property. The informant reported to the officers an encounter that he had with a subject known to him as Danny-Boy. Danny-Boy was described in detail as a white male with brown hair, about twenty-nine to thirty-one years old, five feet ten inches tall, and weighing approximately one hundred and sixty pounds. The informant further related that the subject was pulling burglaries in the lakeview area and that Danny-Boy had asked him if he, or anyone he knew, would be interested in buying some "hot jewelry." After receiving this information, the officers checked the lake-view burglary reports and corroborated the fact that a number of burglaries had recently occurred in that area in which large amounts of jewelry had been stolen. In an attempt to further identify the subject, Danny-Boy, the officers checked the *612 police computer and several other sources, learning from the narcotics division that a white male, Daniel Alfortish, was known to use the moniker Danny-Boy. A cross check through the police computer of the name of Daniel Alfortish revealed that he, in fact, used the alias given by the confidential informant and that he had a previous arrest record. Two days later, on September 10, 1975, Officers Canatella and Hardouin were directed to meet Officer Sidney McCann at the Sailboat Bay Apartments in lakeview in order to investigate a seemingly unrelated report of two apartment burglaries with a possible suspect. A maid from one of these apartments informed the officers that shortly before the burglary someone had knocked but refused to identify himself or herself through the closed door. Upon opening the door a few seconds later, the maid discovered that no one was there but noted that a woman with a camera around her neck and whom she recognized as living in the apartment complex was retreating down the hall. The maid then locked the door and went downstairs to the laundry. On returning about twenty minutes later, she discovered that the apartment had been entered and ransacked. The officers further learned that the woman with the camera had knocked on the doors of several other apartments on the day of the burglary and that the tenants of those apartments had identified the girl as the occupant of apartment 303. Pedestrian traffic in and out of that apartment at all hours of the night was also reported to the officers during the course of their investigation. A check of the apartment rentals disclosed that the burglary suspect who was living in apartment 303 was Paula L. Sierra; residing with her was the man reported by the confidential informer as pulling burglaries in the lakeview area and marketing "hot jewelry," Daniel Alfortish.
The state contends that the facts attested to in the supporting affidavit adequately demonstrated probable cause to believe that stolen property was concealed in apartment 303 of the Sailboat Bay Apartments, 8600 Pontchartrain Boulevard. We agree with this contention.
La.Code Crim.P. art. 162 provides in pertinent part:
A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for the issuance of the warrant.
Probable cause exists when the facts and circumstances within the affiant's knowledge, and of which he has reasonably trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been committed. State v. Hightower, 272 So.2d 363 (La.1973). The judicial officer must be supplied with enough information to support an independent judgment that probable cause exists for the issuance of a warrant. Whitely v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); State v. Holmes, 254 La. 501, 225 So.2d 1 (1969).
When a search warrant is based solely on hearsay, there must be a substantial factual basis upon which the magistrate may find reliable both the informant himself and the information given by him. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); State v. Paciera, 290 So.2d 681 (La.1974). We have recognized that factors which support the credibility of an unidentified informant include prior accurate reports or any specific corroboration of the instant report. A factor which will support the credibility of the information reported is the direct personal knowledge or observation of the informant. Paciera, supra.
In the affidavit before us for review, Officers Canatella and Hardouin swore that their informant had previously given information leading to arrests and convictions, thereby establishing a basis for crediting the reliability of the informant. Moreover, the reliability of the information given was demonstrated by their attestation that the source of the informant's tip was his personal conversation with Danny-Boy, later identified by the police through independent corroborative work as Daniel Alfortish. *613 Hence, we are satisfied that the informant's tip in the instant case met the two prong test for reliability mandated by Aguilar and Paciera.
In addition to the information concerning lakeview burglaries received from the confidential informer, the supporting affidavit detailed the officers' independent investigation of the robberies at the Sailboat Bay Apartments which disclosed that the subject, Daniel Alfortish, resided in apartment 303, the same apartment occupied by defendant whose activities had rendered her the prime suspect in the burglaries that had occurred in the complex. At the suppression hearing, extensive testimony was adduced in an attempt by defendant to discredit the affidavit supporting the search warrant, yet no evidence was introduced that contradicted in any significant way the facts contained therein. Nor was there any indication that the officers perjured themselves in attesting to those facts.
Affidavits must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. A grudging or negative attitude by reviewing courts will tend to discourage police officers from submitting their evidence to a judicial officer before acting. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). We have noted that magistrates are not to be confined to niggardly limitations or by restrictions on their common sense. Their determinations of probable cause should be paid great deference by reviewing courts and, although it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. State v. Nix, 327 So.2d 301 (La.1975); State v. Paciera, 290 So.2d 681 (La.1973).
Applying these principles, we are satisfied that the search warrant under consideration in the instant case contained sufficient allegations of facts, gained both from the reliable confidential informant and from the independent investigatory work of the police, to enable a neutral and detached magistrate to believe that property stolen in the lakeview burglaries was present in the apartment shared by the defendant, Paula Sierra, and Daniel Alfortish.

II.
The second ground defendant urged for suppressing the evidence seized from her apartment was that certain conduct of the police officers during the search rendered the search unreasonable under the fourth and fourteenth amendments of the federal constitution.
Testifying for defendant at the suppression hearing, Daniel E. Alfortish, defendant's co-tenant, claimed that, when the police officers entered the apartment, they pushed him against a wall, slapped a warrant across his face several times, and struck him once in the side with the butt of a shotgun, thereby breaking four of his ribs. In connection with the alleged incident, Alfortish testified that he was examined at West Jefferson Hospital on September 11, 1975 and twice (September 24 and October 3) visited his father's company physician. Defendant offered in evidence a promissory note executed in favor of the hospital in the amount of $45.75 and the medical report of the company physician for the purpose of substantiating Alfortish's testimony. The state objected. The trial judge permitted the introduction of the note, whereupon defense counsel withdrew the offer of the medical report. Apparently, no attempt was made to subpoena either the doctor who treated Alfortish at West Jefferson Hospital or the company doctor who treated him subsequently. Consequently, the record contains no medical evidence to substantiate the claims of Alfortish regarding his injuries where such evidence was available and not produced.
Defendant's version of the police activities during the search included another incident concerning her co-tenant wherein officers supposedly pushed Alfortish's head down into the bathroom toilet. Defendant *614 testified that, when Alfortish was brought back into the living room after this episode, his face was "all wet." When Alfortish himself testified about what happened on the night of the search, however, he apparently forgot about the toilet episode, making no mention of the incident until specifically questioned about it by defense counsel. Even then, Alfortish's testimony differed markedly from that of the defendant; far from claiming that his whole face had been immersed in water, he stated that only the tip ends of the hair in front of his head had gotten wet.
Defendant Sierra's testimony included a further accusation that at the conclusion of the search one of the officers reached into her blouse and jeans, fondling her intimately. Although this was reported to have taken place in front of all of the other officers, the defendant testified that neither the officer accused of the impropriety nor any of the others made any remarks or comments whatsoever. In fact, defendant did not claim that she herself struggled or protested in any way. Interestingly, when the district attorney in cross-examination referred to the alleged police conduct as "abusive," defendant corrected her and characterized it as "disrespectful" instead. We find it significant that Daniel Alfortish, who was apparently present at the time the episode was supposed to have taken place, denied seeing any of the officers touch the defendant.
Quite apart from her recounting of the purported physical mistreatment of herself and Alfortish, the defendant additionally testified that the officers "ransacked" her apartment, went through "everything," and overturned and damaged tables and other furnishings. Defendant introduced sixteen color photographs, allegedly taken two days after the search, in an effort to substantiate her story. The pictures depict loose articles of clothing, books, magazines, children's toys and papers strewn about on the floor of the apartment. They also show pictures taken down from the walls, food and cleaning items spread about on the kitchen floor, and a few drawers removed from their respective bureaus. Contrary to defendant's testimony, the photographs do not reveal that the furniture was overturned nor do they illustrate the knife marks defendant claimed were made on her tabletops. Although she described how her bed had been "broken in half," the photographs indicate only that the bed's metal frame is resting on the floor at one end. While one lampshade appears slightly crushed, none of defendant's other furnishings are shown as broken or damaged in any way. And, despite the fact that the photographs indicate that some clothing was removed from drawers and a dirty clothes hamper without being replaced, they also illustrate that most of the clothing hanging in defendant's closets was not disturbed. The pictures further reveal that the numerous potted plants and hanging baskets situated throughout the apartment were not tampered with or even moved during the search. When questioned concerning this fact, defendant testified that the officers had "poked their fingers around in the pots." We find it quite unusual that officers conducting the kind of search described by the defendant, i. e., "ransacking" the place and going through "everything," would forego the opportunity to dump out mud-filled pots in which stolen jewelry might easily have been concealed. Our examination of the photographs additionally discloses that neither the defendant's mattress nor any of her throw pillows were cut open in an effort to find hidden contraband. We note that she found it difficult, moreover, to explain how it happened that her rather extensive record collection was left in three neat stacks against the living room wall. In short, defendant's photographs illustrate a very disorderly scene in which a variety of loose items are depicted as scattered about in disarray but are otherwise unharmed. Yet the same photographs demonstrate that the very objects which might have been actually damaged by the type of handling alleged, dishes, plants, lamps, records, hanging clothing, etc., somehow escaped the outrageous conduct described by defendant.
*615 During the course of Paula Sierra's testimony, she revealed that the apartment manager walked in shortly before the officers took Alfortish and herself to police headquarters. The court, in an obvious effort to secure the testimony of a disinterested witness, issued an instanter subpoena for Mr. George Marti, the owner-manager of the Sailboat Bay Apartments. When Mr. Marti was shown the sixteen defense photographs, he stated that only four (D-2, D-4, D-10 and D-15) generally depicted the scene at defendant's apartment on the night in question. These four pictures show only miscellaneous objects littering the floor of the defendant's living room and bedroom. Mr. Marti specifically denied that any of the furniture was "smashed up." He seemed unable to recall the crimped lampshade and stated that defendant's bed definitely was not broken when he saw it. While the manager apparently left before the final conclusion of the search, defendant's testimony indicated that his visit occurred just before she and Alfortish were taken out of the apartment. We are impressed by the fact that, at least up to the point of Mr. Marti's departure, there had been no gross disregard for defendant's property. To this extent, the testimony of the building manager contradicts that of defendant who claimed that the officers acted like "animals" throughout the search.
Officer Anthony Canatella, a veteran police officer with nine years of experience in executing search warrants, steadfastly denied that defendant's apartment was left in the condition depicted by the photographs. Officer Canatella stated that defendant's residence was already in a state of disarray when he and the other officers arrived, with pillows and magazines strewn about in a disorderly fashion. He admitted that the search was extensive in view of the fact that they were searching for stolen jewelry which is often concealed in inconspicuous places. However, he further testified that, while some of defendant's possessions may not have been put back where they were found, the officers did not "throw things around" to the extent indicated in the defense photographs. In no uncertain terms, Officer Canatella maintained his position that neither he, nor any of the other officers physically mistreated either defendant or Daniel Alfortish. When questioned as to why defendant would make such allegations of misconduct against the officers, the witness frankly responded: "I think she's nuts." His comment concerning the incident where Alfortish's head was allegedly pushed down into the toilet was that the story was "absurd." Officer Leroy DiFrisco, called as a rebuttal witness for the state, plainly denied that he had hit Alfortish with his shotgun and testified that he did not observe any injuries befall Alfortish on the evening of the search. The officer defendant accused of having been sexually "disrespectful" of her (also called by the state) flatly contradicted this claim and stated that he had not had any physical contact with defendant whatsoever. Defense counsel chose not to cross-examine this witness.
The fourth amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.
Since the historic pronouncements in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the exclusionary rule has operated to prohibit at trial on the merits the introduction of evidence seized in searches which do not comport with the fourth amendment as applied to the states through the due process clause of the fourteenth amendment. The chief justification for this harsh remedy is its deterrent effect on improper police conduct. Although there is certainly no paucity of jurisprudence dealing with the use of the exclusionary rule in regard to warrantless searches and searches made pursuant to warrants issued without probable cause, we have been unable to discover any federal or state *616 court decision employing the exclusionary rule in situations where the initial intrusion on a person's privacy is valid but the subsequent search is conducted without regard for the property of the occupants of the premises searched. While the language of the fourth amendment may arguably extend to searches made with probable cause that are conducted in an improper manner, we note that, in the recent decisions of Stone v. Powell, ___ U.S. ___, 96 S.Ct. 3021, 49 L.Ed.2d 1067 (1976) and United States v. Janis, ___ U.S. ___, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976), the exclusionary rule has come under increasing criticism. In those cases, the Supreme Court observed that after fifteen years of experience with the rule, we are still unable to say whether it has had a significant effect on police conduct. The Court frankly acknowledged its manifest reluctance to utilize the exclusionary rule in new and untried areas without clear proof that the desired deterrent effect would be accomplished. We find it unnecessary to further explore this difficult question since we are satisfied that defendant in the instant case has not demonstrated a fourth amendment violation.
La.Code Crim.P. art. 703 mandates that at a hearing on a motion to suppress physical evidence seized pursuant to a search, the burden of proof is on the defendant to prove the grounds of his motion. In ruling on the evidence adduced during the suppression hearing in the instant case, the trial judge apparently applied the rule set out in article 703 incorrectly, as demonstrated by his remark that "taking the totality of the testimony, and advancing the reasonable doubt, and giving the reasonable doubt to the defendant, I think the evidence in this case should be suppressed. . . ." Nevertheless, since the record before us is complete, containing all of the evidence adduced at the suppression hearing, we find it unnecessary to remand this case to the trial court for a further ruling on the admissibility of the evidence.
A careful review of the record leaves us unimpressed with the evidence presented by defendant in support of her allegations of physical mistreatment of Daniel Alfortish and herself. Even if we credited defendant's photographs with accurately depicting the condition of her apartment after the search (which we do not), at most, they reveal an apartment in a disorderly condition. The photographs do not demonstrate nor are we convinced by the evidence of any wanton or malicious disregard for defendant's property, particularly in view of the fact that the police officers were searching for stolen jewelry contraband which conceivably could be concealed almost anywhere. We do not mean to suggest that we condone police officers leaving the scene of a search in an untidy and disorderly fashion. In executing a search warrant, to the extent possible, due respect should be given to the property of the occupants of the premises searched. We simply find that defendant has not proven that the conduct of the officers in the instant case was of such a nature as to be unreasonable under the fourth and fourteenth amendments of the federal constitution. Accordingly, since the search was conducted under the authority of a valid search warrant issued upon probable cause, there is no justification for excluding the evidence seized pursuant thereto at trial on the merits.

DECREE
For the reasons assigned, the ruling of the trial judge sustaining defendant's motion to suppress the evidence is reversed, and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.
DIXON, J., concurs.
CALOGERO, J., dissents and assigns reasons.
DENNIS, J., concurs in the result only.
CALOGERO, Justice (dissenting).
I respectfully dissent.
In September of 1975, five officers of the New Orleans Police Department, acting under the authority of a warrant, went to the *617 apartment of Paula Sierra and handcuffed her and her friend Danny Alfortish. Following the restraint of these two, a search was undertaken of the entire apartment which consisted of a living room, bedroom, bathroom, and kitchen. The object of the search was to find the items listed in the warrant: a gold bracelet, two rings, and a revolver.[1] One agent was assigned to each room of the apartment and a second officer was assigned to double-check his work by searching the rooms a second time. The five officers conducted a careful, thorough search for approximately one and one-half hours. Not one of the items listed in the warrant nor any other stolen property was discovered. However, as the men were waiting on a small balcony off of the living room and watching for a car that was to pick the officers up, one officer accidentally found a small four-by-four inch flower pot containing small (none more than eight inches tall) marijuana plants. Upon further investigation, a second four-by-four inch pot containing small marijuana plants was discovered on top of a bird cage in the living room.[2] Both Alfortish and Sierra were arrested and Sierra was later charged with cultivation of marijuana, a violation of R.S. 40:966. Upon conviction under this statute a person may be imprisoned for up to ten years at hard labor and, in addition, fined up to fifteen thousand dollars. R.S. 40:966(B)(2).
Defendant Sierra filed a motion to suppress, alleging that the warrant on which the search was made was invalid and, alternatively, that the search exceeded the authority granted by the warrant. The trial judge granted the motion to suppress. The state applied for supervisory writs which we granted because we felt that the trial judge employed an improper standard when he ruled on the case. It seemed that he suppressed the evidence in question because the state had failed to establish beyond "a reasonable doubt" that the warrant was based upon probable cause and that the officers had not exceeded the authority of the warrant.
When an aggrieved party asserts that police officers who have searched his property on the basis of a warrant have violated his fourth amendment right to be free of unreasonable searches and seizures, it is the aggrieved party who bears the burden of establishing that his rights have been violated. C.Cr.P. art. 703. The warrant, which was issued on the authority of a neutral and detached magistrate, should be paid great deference by reviewing courts. United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). And it is assumed that police officers who execute warrants do so in a proper manner and do not trample upon the rights of our citizens.
A reviewing court must, therefore, examine the warrant to determine whether it contained a basis upon which a neutral and detached magistrate could find probable cause to believe that the enumerated items of contraband would be found at the stated address. In this case, we additionally had to consider the merit of defendant's contention that improprieties in the execution of the warrant caused the search to become unreasonable, irrespective of the officers' warrant, and required the fruits of the search to be suppressed.
As to the second proposition, defendant Sierra argues that the officers exceeded the authority of their warrant to search the apartment because they broke four of Danny Alfortish's ribs with a shotgun, fondled her intimately, and needlessly scattered her belongings, destroyed some of her furniture, and damaged the apartment in which she lived. Defendant supports her allegation with a series of sixteen pictures of the *618 apartment taken after the search, testimony of several witnesses to the search including the apartment manager, and Danny Alfortish's medical bill, all of which she contends support her allegation that this search violated her rights guaranteed by the federal and state constitutions.
The state offered three pictures of small portions of the apartment which were taken before the search had ended. The officers admitted that they did not replace all of defendant's belongings, but they stated that they did not break Mr. Alfortish's ribs, fondle Mr. Sierra, or destroy the furniture. The state further asserts that should we find that defendant's rights were violated, her only remedy is a civil action in damages, not suppression of the evidence seized.
I believe that this Court need not have reached the issue presented by defendant's allegation relative to improprieties in execution of the warrant and a consequently-required exclusion of the evidence, because I believe that the trial judge was correct when he suppressed the evidence in this case because the affidavit on which the warrant was based did not contain probable cause to believe that the enumerated items could be found at the designated address.
Article 162 of the Code of Criminal Procedure[3] states in pertinent part:
"A search warrant may issue only upon probable cause established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant."
In order to establish probable cause, the affiant must include factual information which forms the basis on which the magistrate can decide that probable cause exists to believe that the items to be seized are currently contained in the place to be searched. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). A mere suspicion or belief is not sufficient to establish probable cause. State v. Thomas, 329 So.2d 704 (La.1976); State v. Chaffin, 324 So.2d 369 (La.1975); State v. Wells, 253 La. 925, 221 So.2d 50 (1969). Only when the affidavit sets forth those underlying circumstances upon which a judge can conclude that the contraband was on the premises to be searched may he cause the search warrant to issue. Aguilar v. Texas, supra; United States v. Ventresca, supra; State v. Paciera, 290 So.2d 681 (La.1974).
The affidavit at issue before the Court[4] *619 describes information[5] that the affiants received from several sources. An unidentified informant told them that a person he described and knew as "Danny Boy" had attempted to sell him some stolen jewelry. Other police officers told them that a Daniel Alfortish who had an arrest record was known as "Danny Boy." While investigating an apartment burglary at 8600 Pontchartrain Boulevard, they learned from a domestic employee at Apartment 417 that she had seen a woman, who lived in the same apartment complex, near the door to Apartment 417 shortly after the door had been knocked on, and a few minutes before the apartment was ransacked. The officers learned from the lessee of the apartment (an FBI agent) that other residents of the apartment house had told him that a female resident of Apartment 303 had knocked on other doors in the apartment house. The officers then learned from the apartment manager that Apartment 303 was leased to Paula Sierra, and that Danny Alfortish also resided there. They were also told by the apartment manager that complaints had been received about pedestrian traffic to that apartment late at night.
The affidavit contained no information that Paula Sierra had been seen with any jewelry, or that any jewelry had been seen in her apartment, or that she had been involved in any criminal activity of any kind. There were secondhand hearsay reports in the affidavit that she had been seen walking in the halls of the apartment building in which she lived knocking on doors, conduct which seems innocent and does not suggest criminal activity. See Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Nor does the affidavit contain facts which could form the basis for a belief that Daniel Alfortish was concealing contraband in Apartment 303. For example, it contains no information that Alfortish was selling stolen jewelry, or that he was selling anything seen, or even likely to be found, in Apartment 303, or that Apartment 303 contained contraband of any sort, or any jewelry or guns. Nor was there any information in the informer's tip that the "hot jewelry" being sold by a "Danny Boy" was a particular kind of jewelry (which might have matched the jewelry described in the warrant), or that the "hot jewelry" was stolen from any particular *620 apartment or apartment building. In short, I believe the affidavit contains no information on which a magistrate could have concluded that there was probable cause to believe that the bracelet, rings, and gun described in the warrant could be found in Apartment 303 at 8600 Pontchartrain Boulevard.[6]
As I read this record, the foregoing account of the facts in this case is an accurate one. The facts related in the majority opinion are, at the least, misleading. As I review the majority opinion, I am left with the impression that the majority is saying that the affidavit stated that the informer said "Danny Boy" was Danny Alfortish (that is not true), and that the affidavit stated that Danny Alfortish lived in Apartment 303 (that is not true), and that at the suppression hearing the information in the affidavit was generally substantiated (that is not true, in my considered judgment).
This Court has consistently upheld convictions which were attacked on the basis that an illegal search and seizure had violated defendant's rights because we found that the warrant authorizing the search was based on probable cause. In State v. Martin, 318 So.2d 25 (La.1975) we found an affidavit was adequate to support the issuance of a search warrant when the affidavit stated that an informer had personally observed a quantity of coats in the residence which was to be searched, and had learned of their offer for sale. That affidavit also recited that police discovered that a large quantity of coats had been burglarized from a store near the residence a few days before the informer's observations. Likewise, in State v. Thomas, supra, we found that an affidavit did recite facts establishing to the satisfaction of the judge that probable cause existed for the issuance of the search warrant where the affidavit included information that an informant had personally seen the contraband (heroin) in the residence to be searched and that he had seen the defendant, who lived at that residence, selling small packages of white powder. We have also upheld a ruling that a warrant was issued on the basis of probable cause when the warrant was supported by an affidavit which included information that an informant had personally seen contraband for sale at the address to be searched. State v. Roach, 322 So.2d 222 (La.1975).
However, when the information in an affidavit has failed to supply enough factual information so that an issuing magistrate could find that probable cause existed to search a person's premises, we have held that the search was unreasonable by constitutional standards. See State v. Humble, 309 So.2d 138 (La.1975).
The affidavit at issue here does not contain information on which the magistrate could have found probable cause to believe that Paula Sierra had concealed in her apartment the fruits of a burglary, or that Alfortish had done so. The officers believed only that a man named "Danny Boy" was selling "hot jewelry," that Daniel Alfortish, who had an arrest record and purportedly was known as "Danny Boy" had a connection to Apartment 303, and that an apartment in the same building had been robbed. Such information might well cause police to be suspicious about whether Danny Alfortish had been involved in a burglary, but I believe it does not establish the probable cause necessary to support a valid search warrant of Apartment 303. Search warrants cannot issue on a basis only of reputation and police suspicion. Spinelli v. United States, supra; State v. Paciera, supra.
I believe, therefore, that the affidavit in support of the search warrant at issue here lacked sufficient facts upon which a finding of probable cause might be found. I would affirm the trial judge's ruling.
NOTES
[1] The warrant described these items as follows:

"One twelve karat gold bracelet 2" width, one 14 karat gold florentine man's ring with large sokey (sic) topaz stone, one 14 karat gold pinky ring with five small amethyst stones, oriental style, one Smith & Wesson .38 caliber blue steel revolver, 6 inch barrel, other stolen property."
[2] The return on the search warrant describes the plants as "one hundred fifty-five 6-8" green plants."
[3] This statute implements the fourth amendment to the United States Constitution and Article I, section 5 of the Louisiana Constitution of 1974.
[4] The affidavit stated in full as follows:

"The reasons and facts for the request of this search warrant are:
1. On Monday, 9-8-75, Officers Anthony Cannatella and Earl Hardouin met and spoke with a confidential reliable informant whose information has lead to numerous arrests and convictions in the past and the recovery of stolen property, and learned that a subject known to him as `Danny-Boy,' white male, about 5-10, 160 pounds, brown hair about 29-31 years old, was pulling burglaries in the Lakeview area. He stated that the subject Danny Boy asked him if he wanted to buy or if he knew anyone that wanted to buy some `hot jewelry.' He said he told Danny Boy that he was not interested at the time but that he would ask around for him. The Officers then returned to the district station and checked the residence burglary reports for the Lakeview area and found several where large amounts of jewelry were stolen o (sic) police report number I-5562-75, which occurred 9-6-75 where $4200 in jewelry and stereo equipment were stolen, police report number I-5102-75 which occurred on 9-5-75 where $7692.00 in jewelry were stolen. The Officers also found several other burglary reports where jewelry and stereo equipment were stolen. A check with the police dept. NCIC computer of the name Danny Boy to no avail. The Officers then checked with the burglary division of the detective bureau also to no avail. Upon checking with the narcotics division, the Officers learned that two subjects used the name of Danny Boy, one was a Negro male, and the other was a white male one Daniel Alfortish. Upon checking the name Daniel Alfortish in the NCIC computer it showed that there was a subject with a previous arrest record by that name and he used the moniker Danny Boy.
2. On Wednesday, 9-10-75, Officers Anthony Cannatella and Earl Hardouin, assigned to burglary and robbery followup investigations in the Third District, received a call to meet officer Sidney McCann in the Third District station relative to two apartment burglaries with a possible suspect. Upon speaking to Officer McCann the Officers learned that he had just taken a burglary report from a victim who resides at 8600 Pontchartrain Blvd. apt. 408 and also a victim in apt. 417. Officer McCann informed the Officers that the maid in apt 417 was a witness to that burglary, in that while she was ironing some clothes she heard a knock on the door. When she answered the knock there was no reply and a second knock. She again answered the knock and received no reply so she told the caller through the closed door that no one was home but the maid. She waited a few seconds and opened the door and observed a white female walking down the hall with a camera hanging around her neck. The maid, Corine Russell, then left the apartment and went downstairs to the laundry and locked the apartment door. Upon returning about 20 minutes later, she discovered the apartment had been entered and ransacked. She stated that she knew the white female lived somewhere in the apartment complex. The victim FBI agent Jack Nehl, then returned home. The Officers learned from agent Nehl that several other people residing in the complex had complained to him that the same girl that they knew to reside in apt. 303 had knocked on their doors that day also. Upon checking with the manager of the complex it was learned that apt 303 is leased by one Paula Sierra W/F and that she receives mail in three different names, one of which is Paula Levet and that on the rental card it is listed that one Daniel Alfortish also resides in the apartment. The manager also stated that several complaints have been received from other tenants relative to numerous pedestrian traffic into apt. 303 all hours of the night. Upon learned the above from Officer Sidney McCann, the Officers correlated this information with the information they had received from the informant and due to these facts the Officers feel that concealed in the aforementioned apartment, 303, is the property from the burglary of apartment 408 and possibly the property from other apartment burglaries in the same general area."
[5] Much of the information in the affidavit was not substantiated by the testimony at the suppression hearing. Some of it was shown to be erroneous. This fact, however, does not bear upon the narrow legal issue we review: i. e., whether facts on which a magistrate might find probable cause to search were contained within the four corners of the affidavit.
[6] In fact, although the affidavit concludes with the statement the officers felt that apartment 303 contained "the property from the burglary of apartment 408 and possibly the property from other apartment burglaries in the same general area," there is no statement at all that the enumerated items were stolen from apartment 408.